STANLEY v. LONG ISLAND R. CO.

(Supreme Court, Appellate Division, Second Department. December 6, 1912.)

1. RAILROADS (§ 303*)—ACCIDENTS AT CROSSINGS—CARE—DEFECTS—NOTICE.
    Where a train hits a wagon stalled at a crossing, due to a defect therein, to hold the railroad liable it must be shown that it had notice of the defect, or that it had failed in inspecting the crossing to an extent which in law charged it with knowledge of such defect, or that it did not exercise reasonable care in the operation of the train at the crossing.
    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 959–963, 966, 967; Dec. Dig. § 303.*]

2. RAILROADS (§ 348*)—CROSSINGS—ACCIDENTS—WARNING—EVIDENCE.
    In an action for damages for an accident at a crossing, evidence *held* insufficient to show negligence of defendant.
    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 1138–1150; Dec. Dig. § 348.*]

3. RAILROADS (§ 303*)—CROSSINGS—INSPECTION.
    A railroad need not inspect an ordinary rural crossing with any more care than it is called upon to inspect its roadbed in general.
    [Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 959–963, 966, 967; Dec. Dig. § 303.*]

    Hirschberg and Rich, JJ., dissenting.

Appeal from Trial Term, Queens County.

Action by John T. Stanley against the Long Island Railroad Company. Judgment for plaintiff, and defendant appeals. Reversed.

Argued before JENKS, P. J., and HIRSCHBERG, BURR, WOODWARD, and RICH, JJ.

Matthew J. Keany, of New York City, for appellant.
William A. De Groot, of Brooklyn, for respondent.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

WOODWARD, J. The verdict in this case is against the weight of evidence, and ought not to be sustained. The complaint alleges that on or about the 14th day of May, 1908, while one of plaintiff's trucks was being drawn by three of plaintiff's horses, driven by plaintiff's servant upon the Merrick road, in or near Springfield, in the borough of Queens, and was about to cross the tracks of the defendant at the crossing of said railroad in said Merrick road, "one of the wooden planks of said crossing was so defective, and said crossing was so negligently and carelessly maintained by the defendant, * * * and the defendant so failed in its duty to the plaintiff to keep such crossing in proper repair and in a safe condition, that the said plank broke and gave way, and caused a wheel of the plaintiff's truck to sink down and become caught, wedged in, and held fast, so that the said truck could not with due diligence be extricated, nor could said horses be removed from said tracks in time to avoid the accident hereinafter described, all of which was well known," etc., and that "thereupon one of the defendant's trains, through the carelessness and negligence of the defendant as aforesaid, and through the gross carelessness and gross negligence of the defendant * * * in the operation of said train, violently ran into and struck the plaintiff's horses and truck, and killed two of said horses, and seriously injured and maimed the third horse," etc.

The fair import of this complaint is that the defendant was negligent in the maintenance of this crossing, and that the gross negligence alleged in reference to the operation of the train was due to the alleged fact of the defective crossing; for there is nothing in the evidence to indicate that, if the crossing was in proper repair, the defendant was guilty of any act of negligence in operating its train at the rate of 50 miles per hour over a grade crossing in a rural district at about 20 minutes past 4 in the morning. It is conceded that the train whistle was blown for the crossing, there was a straight and apparently unobstructed view of the track for a distance of one mile in the direction from which the train was approaching, and it is not suggested that there was any reason for the defendant to observe any other precautions than were used, except for the fact that this crossing is alleged to have been out of repair and dangerous, and it seems to have been submitted to the jury upon the theory that with the crossing out of repair, as alleged, it might have been the defendant's duty to approach it in the anticipation that an accident might have happened, or at least, seeing a team in the position of the plaintiff's team at a distance, that it might have been the defendant's duty to anticipate that the team could not get out of the way, and to bring the train to a stop in time to avoid the accident.

[1] The plaintiff's story is that he had been stalled at this grade crossing for about 15 minutes before he heard the automatic bell announcing the defendant's approaching train, so that it must be obvious that, except for his becoming stalled, he had no reason to complain of the operation of the train, and the gravamen of the action is the alleged defective crossing; and before there can be any justification for holding the defendant liable for any alleged negligence

in the operation of the train, it must be shown that it had notice of the alleged defect, or that it had failed in its duty of inspecting the crossing to an extent which in law charged it with knowledge of such defect. If there was no defect in the crossing for which the defendant was liable, if the plaintiff has failed to establish by a fair preponderance of evidence that the crossing was in fact defective, and that the defendant should have known of this defect, then there was no duty on the part of the defendant to anticipate that the plaintiff would be stalled at this crossing, and it owed no other duty than to use reasonable care to stop its train upon discovering the danger, and the evidence is undisputed that the engineer of defendant's train did use such care immediately upon discovering the danger which threatened.

[2] It is true, of course, that the plaintiff's driver testified that, after hearing the automatic bell, he started to run down the track to meet the train, shouting a warning, etc., and that he had reached a point 1,000 feet from the crossing when the train passed him; but this is so inherently improbable, and is so contrary to the testimony of disinterested witnesses, that it ought not to form the foundation for a judgment for damages. This witness says that he had been at work for 15 minutes trying to extricate his wagon, telling the details of what he did, and that when he heard the automatic bell for the oncoming train he abandoned this work and ran down the track to meet the train. There is no very definite testimony as to the distance of the train from the crossing at the time this automatic bell sounded, but the fair inference is, from all the testimony, that it was not to exceed one mile away. The witness testified that the track was straight for over a mile, in his judgment, from the crossing, and that he saw the train "soon after it came in sight"; that "when the signals rang on the crossing, I ran up the track as fast as I could toward where the train was coming."

Assuming that the train was a full mile away when the automatic bell began to ring, and that the witness started to run on the instant, is it possible that he could have run 1,000 feet while the defendant's train, running at the rate of 50 miles an hour, was running approximately 4,280 feet? Is it not far more likely that, as testified to by two disinterested witnesses, the plaintiff's driver actually ran from 150 to 200 feet in the direction the train was coming from, and that the engineer stopped as soon as it was possible after his attention was called to the situation? The evidence is to the effect that the train could be stopped in 800 or 900 feet, and the undisputed evidence is that the train came to a standstill about 600 feet beyond the crossing, so that, if the testimony of the disinterested witnesses is to be believed, in connection with its greater probability, it is entirely in harmony with what actually occurred; for it shows the train coming to a stop within 900 feet of the place where the plaintiff's witness must have met the train, running 200 feet to meet it. There is no dispute that the engineer of the defendant's train brought it to a standstill 600 feet beyond the crossing, and there is no evidence in the case from which it can be inferred that this could have been accomplished in less than 800 to 900 feet, so that we must assume that the

engineer began shutting off steam and applying his brakes 200 to 300 feet before he reached the crossing. As it was practically impossible that the witness could have run the distance which he claims in the time which he had after the automatic bell began ringing, and all the evidence is in harmony with the theory that he proceeded 150 to 200 feet, it must be evident that the plaintiff has failed to produce a preponderance of evidence in support of his contention that he warned the engineer at a distance of 1,000 feet from the accident, and we pass on, therefore, to the claim that the crossing was defective.

The plaintiff's driver testified that he was familiar with this crossing, and that he had passed over it twice a week for four years; and in response to questions by the court he testified that the crossing gave no evidence of being out of repair to look at it, and that it showed no indications of wear. Yet he testifies that, when he reached a point where a single plank intervened between the macadam and the steel rail of the railroad track, one of the front wheels of his wagon crushed through this 3-inch pine plank, which showed no evidences of wear, and dropped down about 4 inches, and became wedged in such a manner that he could not go forward or back, or twist the wagon loose. To have accomplished this result the wheel must have crushed directly through the plank, much as a saw would have cut a channel through it, and at the same time have been of sufficient strength to prevent the wheel swinging around; for this same witness tells us that he unfastened one of the horses and hitched him to the end of the wagon tongue in an effort to veer the wagon around out of danger, and that he could not do this. The plaintiff himself testifies in a general way that, when he came upon the ground some hours later, he found that the plank appeared to be decayed; but he does not appear to have had good eyesight, for he admits that he could not see the eyes of the presiding justice, though he could see the desk, and he says that he did not pick the plank, or make any special effort to ascertain its condition. He says:

"I did not pick at it; but, the way I looked at it, it appeared to me, and I believe, it was rotten. I do not say rotten, but somewhat decayed, by being down there so long; being next to the ground, it had rotted the wood."

His driver, however, says that it gave no evidence of wear, and says nothing about its being rotten; and if it was rotten enough, so that the wheel could drop through it in the manner testified to by the driver, then it is difficult to believe that it could have been strong enough to have resisted the pulling of the horses in the manner described, while, if it was not rotten, it would not have broken squarely, but would have splintered and bent under the pressure. Indeed, the whole story is improbable, and, assuming it to be true, there was no reason why the defendant should have known of this condition in such a manner as to have anticipated this result. The crossing was an ordinary planked crossing, the plank was originally 3 inches in thickness and 12 inches in width, and it is doubtful if in all the history of grade crossing accidents in this country one such as is here described has ever heretofore happened.

[3] The plaintiff's own witness says the plank showed no wear,

and there is no proper evidence in this case that the plank was rotten to any considerable degree, if at all, and just how the railroad company would be expected to discover the defect which is alleged to have developed under the wheel of plaintiff's truck is not clear. Two witnesses who saw the crossing before the accident testify that it was apparently in a proper condition on the day or evening before the accident, and the mere fact that in this isolated case the particular accident happened is not sufficient to hold the defendant liable for the damages. . The plank was placed, so far as appears, in the ordinary manner upon the ends of the cross-ties, which were not shown to have open spaces between them, and presented the appearance of having been placed upon the ground for the purpose of bringing the level of the roadway to that of the top of the rail. There was nothing in this situation which called upon the railroad company to watch over this crossing with extraordinary care. It was performing its duty when it gave to this crossing the same general inspection which it was called upon to give to its roadbed in general, and the evidence is undisputed that this much was done through the proper servants.

But, beyond all this, two disinterested witnesses testified that the plaintiff's wagon was driven, not upon the 16 feet of macadam, but with the left wheels about 16 or 18 inches off the macadam, and that when the wagon reached the railroad track the front wheel was so far to the left of the prepared roadway that it did not strike the planking at all, but that it sank into the soft ground at the end of the plank, and that this was the cause of the accident. Moreover, there is evidence in the case of the most positive character, and by disinterested witnesses, to the effect that the plank in question was found after the accident with one end of it split down for a short distance, following the grain of the wood, a result which might easily have been brought about by colliding with some part of the wagon, which was crushed in the accident, but which could not have produced the accident, as the witness described it in behalf of the plaintiff. When we take into account the fact that the plaintiff's driver had been on the road from about 1 o'clock in the morning, that he admits that he was at the time on the left-hand side of the road, that he talks about having taken the left-hand side of the road to get around two farmers, who left immediately after the accident, and who were not seen by any of the eyewitnesses of the accident, the improbability of his own story and the probability of the defendant's theory of the case is greatly increased. The driver, in all probability, fell asleep, and his team drifted off the macadam for the softer footing, and the driver remained oblivious to this fact until his wheel came into contact with the railroad track and the team stopped.

Under the evidence in this case the plaintiff has clearly failed to sustain the burden of proof, and the verdict of the jury is against the weight of evidence, and should be reversed.

The judgment and order appealed from should be reversed, and a new trial granted; costs to abide the event.

JENKS, P. J., and BURR, J., concur. HIRSCHBERG and RICH, JJ., dissent.